UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAHAIRA REYES,

                              Plaintiff,

        v.

BEDFORD CENTRAL SCHOOL
DISTRICT, SUSAN MESSINA, DEBRA
JACKSON, SUSAN OSTROFSKY, GENA
BENZ, and LINDA SCHLUTER,

                              Defendants.

No. 16-CV-2768 (KMK)

OPINION & ORDER

Appearances:

Donald L. Doernberg, Esq.
Penn Valley, CA
*Counsel for Plaintiff*

Lewis R. Silverman, Esq.
Karen C. Rudnicki, Esq.
Silverman & Associates
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Jahaira Reyes ("Plaintiff") brings this Action against Defendants Bedford

Central School District, Susan Messina, Debra Jackson, Susan Ostrofsky, Gena Benz, and Linda

Schluter (collectively "Defendants"), alleging violations of her rights under the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., 42 U.S.C. § 1983, 42 U.S.C.

§ 2000d, N.Y. Const. art. I, § 11, N.Y. Civ. Rights Law § 40-c, and N.Y. Comp. Codes R. &

Regs. tit. 8, §§ 100.2(ee), 117.2, 117.3, and 154.2, arising out of Plaintiff's enrollment and

education at elementary school in the Bedford Central School District (the "District"). (*See*

Second Am. Compl. (Dkt. No. 40).)  Before the Court is Defendants' Motion To Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (*See* Dkt. No. 43.)  For the reasons to follow, the Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from the Second Amended Complaint and are presumed true for purposes of this Motion.

Plaintiff was born in Mount Kisco, New York in 1997 and has lived there since her birth—she is a natural-born citizen of the United States.  (*See* Second Am. Compl. ¶¶ 8–10.) Plaintiff's native language is English, and she only began to study Spanish in high school.  (*See id.* ¶¶ 13–14.)  Her parents, however, are from Ecuador and El Salvador and are fluent in Spanish, with English as their second language.  (*See id.* ¶ 15.)  This Action arises out of Plaintiff's education in the District in elementary school, which began in 2002.  (*See id.* ¶¶ 12, 18.)  Plaintiff turned 18 years old in 2015.  (*See id.* ¶ 11.)

Starting in Plaintiff's kindergarten year at Mt. Kisco Elementary School, Plaintiff was classified by Defendants as a Limited English Proficient ("LEP") student.  (*See id.* ¶ 20.)  At no point in time did Defendants ever test whether Plaintiff spoke a language other than English and, indeed, Plaintiff spoke no other language during her time in elementary school.  (*See id.* ¶¶ 21– 22.)  In the fall of Plaintiff's kindergarten year, Plaintiff's parents and adult sister informed the District that Plaintiff spoke no language other than English, but the District did nothing in response.  (*See id.* ¶¶ 24–25.)  Plaintiff received instruction in English as a Second Language ("ESL") through January 22, 2008, by which time Plaintiff was in fifth grade.  (*See id.* ¶ 28.)

According to Plaintiff, the District's actions with respect to Plaintiff were consistent with their policy and practice. (*See id.* ¶ 29.) Specifically, an affidavit from Marina Moran, the former Elementary Consulting Teacher for the District's English-As-a-Second-Language Program, spells out the process:

> Once the District has been notified of the presence of a language other than English in the home, an informal interview with the child is conducted by a certified [Teacher of English to Speakers of Other Languages] who, based on the responses given by the child, determines in his or her professional judgment whether a formal English proficiency assessment . . . is warranted. Based on the results of the [assessment], a student is required to be identified as LEP and provided with services in an ESL program. Once a student has been placed in an ESL program, the student must test proficient on the New York State English as a Second Language Achievement Test ("NYSESLAT") in order to be identified as proficient in English and removed from ESL services.

(Second Am. Compl. Ex. A ¶ 4.) Moran further explained that when she reviewed Plaintiff's English proficiency assessment scores, the scores were in the percentile that deemed her not proficient in English under the Rules and Regulations of the New York State Commissioner of Education. (*See id.* ¶ 3.) Although Plaintiff's family expressed concern over Plaintiff's placement in an ESL program because she spoke only English, Moran explained that "the issue [was] not simply whether a student can speak or understand English, but rather the effect on the student's acquisition of academic English language skills due to the presence of other language(s) spoken in the home." (*Id.* ¶ 4.) An email from Linda Schluter, then the Assistant Superintendent of Special Education and Student Services for the District, expressed that it was her view that the District's treatment of Plaintiff was consistent with state law. (*See* Second Am. Compl. Ex. B.)

Plaintiff's ESL instruction regularly took place outside of her regular classroom, and she frequently missed academic instruction that was going on in her regular classroom during her ESL instruction. (*See* Second Am. Compl. ¶¶ 31–32.) Moreover, Defendants regularly required

Plaintiff to take tests in a special location, away from her classmates, with other students of Hispanic ancestry. (*See id.* ¶ 35.) According to Plaintiff, being separated from the rest of her class caused her "great upset [sic], mental anguish and embarrassment, was educationally unnecessary, and deprived her of educational opportunities." (*Id.* ¶ 36.) Plaintiff alleges that the District "characterized [Plaintiff] as an LEP student only because she is of Hispanic descent." (*Id.* ¶ 33.)

During Plaintiff's second-grade year, she began to struggle with her schoolwork and her performance fell below second-grade standards. (*See id.* ¶¶ 37–38.) The District did not evaluate Plaintiff for any educational disability. (*See id.* ¶ 40.) In third grade, Plaintiff's teacher noted that Plaintiff sometimes "display[ed] what appear[ed] to be a 'disconnect' where she seem[ed] to be following lesson/skill and then 'los[t]' thought/place or g[a]ve[] an unrelated response." (*Id.* ¶ 41 (some internal quotation marks omitted).) The teacher advised to "[k]eep an eye on this" because it "could be attention related or processing issue." (*Id.* (some internal quotation marks omitted).) The District again failed to evaluate Plaintiff for any educational disability. (*See id.* ¶ 43.) Plaintiff continued to struggle in fourth grade, and her teacher noted that "[Plaintiff] [was] still an ESL student. She [was] at an advanced level. [The teacher] believe[d] there [was] something other than this stopping [Plaintiff] from making adequate progress." (*Id.* ¶ 45 (internal quotation marks omitted).) Again, the District did not evaluate Plaintiff for any educational disability. (*See id.* ¶ 47.)

In the fifth grade, the District did not conduct any special education assessment until Plaintiff's family retained counsel. (*See id.* ¶ 50.) Thereafter, it was discovered that Plaintiff has Attention Deficit Hyperactivity Disorder—Combined type ("ADHD") and is dyslexic, and had had those conditions throughout her entire enrollment in the District. (*See id.* ¶¶ 51–53.) By

way of her ADHD and dyslexia, Plaintiff was eligible for classification under the IDEA, but was not identified as such by the District until the fifth grade. (*See id.* ¶ 55.) Because of this, Plaintiff alleges that she was denied a free, appropriate public education ("FAPE") under the IDEA. (*See id.* ¶ 56.)

When Plaintiff's family protested during her kindergarten through fourth-grade years that Plaintiff did not belong in ESL and needed additional help, the District responded only that Plaintiff was in ESL. (*See id.* ¶ 57.) Plaintiff alleges that the District refused to evaluate Plaintiff under the IDEA because she was an ESL student. (*See id.* ¶ 58.)

After Plaintiff began to receive special education services under the IDEA, her academic performance improved. (*See id.* ¶ 59.) Plaintiff believes that she would have struggled less in elementary school and done better in middle and high school had she been properly identified as being in need of special education services earlier. (*See id.* ¶¶ 60–61.)

B. Procedural History

Plaintiff filed the Complaint in this Action on April 13, 2016. (*See* Dkt. No. 1.) Before any of Defendants answered, Plaintiff filed an Amended Complaint on April 19, 2016. (*See* Dkt. No. 10.) On May 9, 2016, Defendants filed a letter motion seeking leave to file a motion to dismiss, arguing that Plaintiff had not exhausted her IDEA claims and that her state-law claims were barred by collateral estoppel. (*See* Letter from Lewis R. Silverman, Esq., to Court (May 9, 2016) (Dkt. No. 15).) Plaintiff responded on May 16, 2016, contending that exhaustion was not required in these circumstances and that the state administrative proceeding does not have preclusive effect. (*See* Letter from Donald L. Doernberg, Esq., to Court (May 16, 2016) (Dkt. No. 16).) After a premotion conference was held, (*see* Dkt. (minute entry for June 21, 2016)), the Court set a briefing schedule for the Motion To Dismiss, (*see* Dkt. No. 22). On August 2,

2016, however, Plaintiff filed a letter seeking leave to file a Second Amended Complaint. (*See* Letter from Donald L. Doernberg, Esq., to Court (Aug. 2, 2016) (Dkt. No. 27).) Although the application was opposed, (*see* Dkt. No. 28), the Court held a conference and granted the application, setting a new briefing schedule for Defendants' Motion To Dismiss, (*see* Dkt. No. 39).

On September 22, 2016, Plaintiff filed her Second Amended Complaint. (*See* Dkt. No. 40.) On October 24, 2016, Defendants filed their Motion To Dismiss and supporting papers. (*See* Dkt. Nos. 43–45.) Plaintiff filed her opposition papers on November 11, 2016, (*see* Dkt. Nos. 47–48), and Defendants filed their reply papers on December 5, 2016, (*see* Dkt. Nos. 51–52).

## II. Discussion

### A. Standard of Review

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are substantively identical." *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (internal quotation marks omitted); *see also Neroni v. Coccoma*, No. 13-CV-1340, 2014 WL 2532482, at *4 (N.D.N.Y. June 5, 2014) (same), *aff'd*, 591 F. App'x 28 (2d Cir. 2015). "In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff." *Gonzalez*, 2014 WL 2475893, at *2 (internal quotation marks omitted); *see also Seemann v. U.S. Postal Serv.*, No. 11-CV-206, 2012 WL 1999847, at *1 (D. Vt. June 4, 2012) (same). However, "[o]n a Rule 12(b)(1) motion, . . . the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the

burden of proof on a motion to dismiss under Rule 12(b)(6)." *Gonzalez*, 2014 WL 2475893, at *2; *see also Sobel v. Prudenti*, 25 F. Supp. 3d 340, 352 (E.D.N.Y. 2014) ("In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." (internal quotation marks omitted)). This allocation of the burden of proof is "[t]he only substantive difference" between the standards of review under these two rules. *Smith v. St. Luke's Roosevelt Hosp.*, No. 08-CV-4710, 2009 WL 2447754, at *9 n.10 (S.D.N.Y. Aug. 11, 2009), *adopted by* 2009 WL 2878093 (S.D.N.Y. Sept. 2, 2009); *see also Fagan v. U.S. Dist. Court for S. Dist. of N.Y.*, 644 F. Supp. 2d 441, 446–47 & n.7 (S.D.N.Y. 2009) (same).

## 1. Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (internal quotation marks omitted). "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *see also Butler v. Ross*, No. 16-CV-1282, 2016 WL 3264134, at *3 (S.D.N.Y. June 14, 2016) (same). Nevertheless, "[u]nlike Article III standing, which ordinarily should be determined before reaching the merits, statutory standing may be assumed for the purposes of deciding whether the plaintiff otherwise has a viable cause of action." *Coan v. Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006) (citation omitted). While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all

uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alteration and internal quotation marks omitted); *see also Ray Legal Consulting Grp. v. Gray*, 37 F. Supp. 3d 689, 696 (S.D.N.Y. 2014) ("[W]here subject matter jurisdiction is contested a district court is permitted to consider evidence outside the pleadings, such as affidavits and exhibits.").

### 2. Rule 12(b)(6)

When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The Court, however, is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Specifically, the plaintiff must allege facts sufficient to show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed," *Twombly*, 550 U.S. at 570.

On a Rule 12(b)(6) motion to dismiss, the question "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012). Accordingly, the "purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks omitted). To decide the motion, the Court "may consider facts asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (internal quotation marks omitted).

B.  Analysis

1.  Subject Matter Jurisdiction

Before proceeding to an analysis of the merits, the Court must first determine whether it has subject matter jurisdiction over the federal claims, which arise under the IDEA, Title VI of the Civil Rights Act, 42 U.S.C. § 2000d ("Title VI"), and 42 U.S.C. § 1983.

"The IDEA's purpose is 'to ensure that all children with disabilities have available to them a free appropriate public education,'" which, "[i]n practice, . . . means that [s]tates have an affirmative obligation to provide a basic floor of opportunity for all children with disabilities." *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016) (quoting 20 U.S.C. § 1400(d)(1)(A)). Accordingly, the IDEA requires that "states receiving federal funds . . . provide 'all children with disabilities' a 'free appropriate public education.'" *Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 376 (2d Cir. 2014) (quoting 20 U.S.C. § 1412(a)(1)(A)). To provide a FAPE, a school district must offer "special education and related

services tailored to meet the unique needs of a particular child, which are reasonably calculated to enable the child to receive educational benefits." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 238–39 (2d Cir. 2015) (internal quotation marks omitted).

"It is well-settled that, prior to bringing a suit in federal court under [the] IDEA, plaintiffs must exhaust all available administrative procedures." *See Scaggs v. N.Y. Dep't of Educ.*, No. 06-CV-799, 2007 WL 1456221, at *4 (E.D.N.Y. May 16, 2007) (citing 20 U.S.C. § 1415(*l*)).[1] In New York, that administrative procedure involves an application before an Independent Hearing Officer, whose decision may be appealed to a State Review Officer. *See* N.Y. Educ. Law § 4404(1)–(2). That decision may, in turn, be challenged by an appeal to either state or federal court. *See* 20 U.S.C. § 1415(i)(2)(A). "A plaintiff's failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction." *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002).

Although the IDEA provides a federal cause of action to enforce a disabled student's rights, the provision relating to exhaustion of administrative remedies is broadly written, stating that "before the filing of a civil action under [other] laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter." 20 U.S.C. § 1415(*l*). The Second Circuit has interpreted this provision to mean that "potential plaintiffs with grievances related to the education of disabled children generally

---

[1] The purpose of this requirement is to "channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances." *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 487 (2d Cir. 2002). This requirement also "prevents courts from undermining the administrative process and permits an agency to bring its expertise to bear on a problem as well as to correct its own mistakes." *Heldman v. Sobol*, 962 F.2d 148, 159 (2d Cir. 1992).

must exhaust their administrative remedies before filing suit in federal court, even if their claims are formulated under a statute other than the IDEA." *Polera*, 288 F.3d at 481.

a. Applicability of Exhaustion Requirement

With respect to Plaintiff's claim under the IDEA, there is no question that the claim is subject to the IDEA's exhaustion requirement. Plaintiff's IDEA claim is premised largely on the failure of the District to fulfill its child-find obligation, that is, its obligation to identify, locate, and evaluate "[a]ll children with disabilities . . . who are in need of special education and related services." 20 U.S.C. § 1412(a)(3)(A); *see also* 34 C.F.R. § 300.111(a)(1)(i).[2] This obligation extends to children who are merely suspected of having a disability, *see* 34 C.F.R. § 300.111(c)(1), and once a school has reason to suspect a student has a disability, the school must conduct an evaluation of the child within a reasonable time, *see Reg'l Sch. Dist. No. 9 Bd. of Educ. v. Mr. & Mrs. M*, No. 07-CV-1484, 2009 WL 2514064, at *8 (D. Conn. Aug. 7, 2009).

Plaintiff engages in a lengthy discussion about the practical and policy implications of requiring litigants asserting a child-find claim under the IDEA to exhaust their administrative remedies. (*See* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. To Dismiss Pursuant to Rule 12(b)(1), 12(b)(6) ("Pl.'s Opp'n") 11–15 (Dkt. No. 48).) Absent from Plaintiff's brief, however, is even a single case holding that the IDEA's exhaustion requirement does not apply to child-find claims, or a single citation to any provision in the statute that would suggest as much. As Defendants point out, (*see* Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") 9 (Dkt. No. 45)), at least one court in the Second Circuit has dismissed child-find claims for failure to exhaust, *see P. v. Greenwich Bd. of Educ.*, 929 F. Supp. 2d 40, 47–50 (D. Conn. 2013), and

---

[2] Plaintiff has acknowledged that this is the basis of her IDEA claim. (*See* Second Am. Compl. ¶ 63–71; Pl.'s Opp'n 12 ("This is a child-find case.").)

there is no authority holding otherwise, *see, e.g.*, *Ripple v. Marble Falls Indep. Sch. Dist.*, 99 F. Supp. 3d 662, 690 (W.D. Tex. 2015) (holding that child-find claims are subject to the IDEA's exhaustion requirement). While Plaintiff argues that this case is factually distinguishable from *P.*, (*see* Pl.'s Opp'n 14–15), the issue is not whether Plaintiff's case is similar on the facts, but rather whether there is any question that child-find claims are subject to exhaustion, like every other IDEA claim.

Even were the Court inclined to entertain Plaintiff's policy arguments, however, they are meritless. Plaintiff argues that imposing an administrative exhaustion requirement in a child-find case is inconsistent with the District's obligation to locate children in need of special education services because it places the burden on parents to detect their child's need for special attention. (*See id.* at 12–13.) This requirement, in Plaintiff's view, "would disproportionally [sic] affect children from families where the parents are not well educated, well-versed in American law, or for whom English is a second language." (*See id.* at 14.) The problem with Plaintiff's objections, however, is that they make sense, if at all, only if damages for past conduct are available under the IDEA, which they are not. *See Polera*, 288 F.3d at 486 ("We therefore hold that monetary damages are not available under the IDEA."). Thus, the fact that exhaustion functions as a jurisdictional bar in these circumstances (where only monetary damages could offer Plaintiff any relief) is not inconsistent with the IDEA. In fact, it is just the opposite: "The purpose of the IDEA is to provide educational services, not compensation for personal injury, and a damages remedy—as contrasted with reimbursement of expenses—is fundamentally inconsistent with this goal." *Id.* As noted, the reason the IDEA imposes an exhaustion requirement is to encourage administrative review and resolution of educational disputes by giving the child the education he or she needs, not by awarding damages years after the fact. *See*

*id.* at 487.  There is nothing unusual or inappropriate about requiring IDEA claimants to seek contemporaneous remedies for their injuries as opposed to seeking damages later, as that is the type of relief the IDEA contemplates, and that is precisely the goal that the administrative exhaustion requirement seeks to effect.

Somewhat confusingly, the only cases Plaintiff cites in support are those where child-find claims *were* exhausted prior to bringing the claims in federal court.  *See Sch. Bd. of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928, 934 (E.D. Va. 2010); *N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 15 (D.D.C. 2008); *New Paltz Cent. Sch. Dist. v. St. Pierre ex rel. M.S.*, 307 F. Supp. 2d 394, 395 (N.D.N.Y. 2004).  Administrative exhaustion was not such an onerous burden in those cases that the child's rights could not be vindicated by the means proscribed by the IDEA.  Accordingly, because there is no dispute that the child-find claims fall within the purview of the IDEA, based on the plain language of the statute, *see* 20 U.S.C. § 1415(*l*), and binding case law, *see Polera*, 288 F.3d at 483, the exhaustion requirement applies.

More difficult, however, is whether the other federal claims raised by Plaintiff—those claims arising under Title VI, (*see* Second Am. Compl. ¶¶ 72–75), and § 1983 for violations of Plaintiff's rights under the Equal Protection Clause, (*see id.* ¶¶ 76–80)—are also subject to exhaustion.  Plaintiff alleges that Defendants impermissibly discriminated against her on the basis of national origin when they required her to undergo an English-language-proficiency evaluation and failed to provide her with needed educational opportunities.  (*See id.* ¶¶ 72–80.)  According to Plaintiff, these claims are not subject to exhaustion.  (*See* Pl.'s Opp'n 5, 8–11.)

As noted above, the purpose of the exhaustion requirement is to "channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances."  *Polera*, 288 F.3d at 487.

13

Litigants must therefore comply with the exhaustion requirement "not only when they wish to file a suit under the IDEA itself, but also whenever they assert claims for relief *available* under the IDEA, regardless of the statutory basis of their complaint." *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 246 (2d Cir. 2008). The Second Circuit, adopting the reasoning of the Seventh Circuit in *Charlie F. v. Board of Education of Skokie School District*, 98 F.3d 989 (7th Cir. 1996), has clarified that "relief available" should be read "to mean relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers." *Polera*, 288 F.3d at 488 (internal quotation marks omitted). The Second Circuit has construed the IDEA, in this respect, to apply to "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education." *Cave*, 514 F.3d at 245 (internal quotation marks omitted).

For this reason, even though damages are unavailable under the IDEA, the Second Circuit has held that "a disabled student who claims deficiencies in her educational program may not bypass the IDEA's administrative exhaustion rule merely by claiming monetary damages." *Id.* at 247. Although the Second Circuit has only so held in circumstances where monetary damages were sought *in addition* to some other type of relief available under the IDEA, district courts in the Second Circuit have consistently applied the exhaustion requirement even where the only relief sought was damages. *See, e.g.*, *Murphy v. Town of Wallingford*, No. 10-CV-278, 2011 WL 1106234, at *6 (D. Conn. Mar. 23, 2011) ("[A]lthough the plaintiffs seek monetary damages other than those available under the IDEA, a plaintiff's request for such monetary relief does not abrogate the IDEA's exhaustion requirements."); *Dallas v. Roosevelt Union Free Sch. Dist.*, 644 F. Supp. 2d 287, 293 (E.D.N.Y. 2009) (holding that where "the plaintiffs no longer [sought] educational services from the [d]istrict, but instead [sought] monetary damages,"

exhaustion was nonetheless required because "a claim for monetary damages stemming from the denial of a free appropriate education does not permit the plaintiff to sidestep the exhaustion requirements of the IDEA" (internal quotation marks omitted)); *Gardner v. Uniondale Pub. Sch. Dist.*, No. 08-CV-847, 2008 WL 4682442, at *7 (E.D.N.Y. Oct. 21, 2008) ("[T]he fact that [the] plaintiff is only seeking monetary damages, which are not available under the IDEA, does not necessarily mean that they avoid application of the IDEA's exhaustion requirement.").

Courts in the Second Circuit also have reaffirmed, time and time again, that claims based on an allegation that a child in need of special education was denied educational opportunities because of their race or some other impermissibly discriminatory reason must be exhausted under the IDEA, regardless of the statutory source of the claim. *See, e.g.*, *Wang v. Williamsville Cent. Sch. Dist.*, No. 08-CV-575S, 2010 WL 1630466, at *6 (W.D.N.Y. Apr. 21, 2010) (dismissing discrimination claims for failure to exhaust because "[t]he gravamen of [the plaintiffs'] claim [was] the failure to provide appropriate services to [the child]; the purported reason for the failure—race discrimination—[was] secondary"); *Karlen ex rel. J.K. v. Westport Bd. of Educ.*, 638 F. Supp. 2d 293, 300 (D. Conn. 2009) ([T]his [c]ourt lacks subject matter jurisdiction for any claims arising from the denial of educational services or environments or the provision of insufficient educational services to [the children], irrespective of whether the alleged conduct was caused by racial discrimination or animus."); *DiStiso v. Town of Wolcott*, No. 05-CV-1910, 2006 WL 3355174, at *4 (D. Conn. Nov. 17, 2006) (dismissing some race discrimination claims where the alleged discrimination resulted in "the loss of the benefit of a free public education," because "[a]ny of [the] [p]laintiff's claims which are based on conduct pursuant to the [d]efendants' obligations under the IDEA cannot stand, even if they are claims for relief not provided by the IDEA" (internal quotation marks omitted)); *Hope v. Cortines*, 872

F. Supp. 14, 19 (E.D.N.Y. 1995) (dismissing the plaintiffs' race discrimination claims under § 1983 and Title VI because "[t]here exists no doubt that [§] 1415(f) [of the IDEA] applies to claims asserted under [§] 1983 and [Title VI]"), *aff'd*, 69 F.3d 687 (2d Cir. 1995). These cases are in line with the Second Circuit's reasoning that a child or the parent of that child could have pursued administrative remedies at the time the school district provided allegedly inadequate educational services, and their choice to wait until later to seek damages for those deficient services does not absolve them of their obligation to exhaust administrative remedies. *See Polera*, 288 F.3d at 488 ("Where . . . a full remedy is available at the time of injury, a disabled student claiming deficiencies in his or her education may not ignore the administrative process, then later sue for damages."); *see also Gardner*, 2008 WL 4682442, at *15 ("The gravamen of [the] plaintiffs' claims here relate to the educational services provided to a disabled child by the alleged mishandling of her disability, claims that could have been resolved by administrative proceedings at the time of injury.").

Here, Plaintiff has left no doubt that the discrimination claims seek to vindicate her rights under the IDEA:

> Defendants characterized [Plaintiff] as LEP and subjected her to ESL only because she is Hispanic and her parents' native language is Spanish. Defendants used ESL as an excuse to take no investigative action when the family repeatedly begged for help. As a result, for second, third, fourth and half of fifth grade, Defendants withheld from [Plaintiff] educational services to which the law entitled her. The chain of causation is direct and unbroken.

(Pl.'s Opp'n 8.) This statement of the case comports with the allegations in the Second Amended Complaint, which includes that "[t]he District's failure and refusal to evaluate [Plaintiff] and to provide services from her kindergarten year until midway in her fifth grade year caused [Plaintiff] to be unable to receive a free, appropriate, public education within the meaning of [the IDEA] and to be unable to achieve progress at grade level," (Second Am. Compl. ¶ 56),

and Plaintiff "would have struggled less and done better" in both elementary school and middle and high school if the District "had provided appropriate educational services," (*id.* ¶¶ 60–61). Plaintiff does allege that "[t]he District characterized [Plaintiff] as an LEP student only because she is of Hispanic descent," (*id.* ¶ 33)—an allegation contradicted by the affidavit Plaintiff attached to her complaint, (*see* Second Am. Compl. Ex. A ¶¶ 2–4), and not otherwise supported by any factual allegations in the Second Amended Complaint—but, as in *Wang*, the "gravamen of the[] claim is the failure to provide appropriate services to [Plaintiff]; the purported reason for the failure—. . . discrimination—is secondary," 2010 WL 1630466, at *6. Plaintiff's discrimination claims are thus plainly focused on the deprivation of educational services owed to her under the IDEA and accordingly are subject to exhaustion. *See Polera*, 288 F.3d at 481 ("[P]otential plaintiffs with grievances related to the education of disabled children generally must exhaust their administrative remedies before filing suit in federal court, even if their claims are formulated under a statute other than the IDEA.").

Plaintiff raises a number of arguments for why exhaustion should not be required for these claims. First, she invokes tort law, which holds that "[t]he initial tortfeasor is liable for all of the victim's injuries," "[e]ven if the victim's injury is far more severe than one might have anticipated (as from an unknown vulnerability)." (Pl.'s Opp'n 8.) It is unclear to the Court what relevance tort law has to the simple question presented here: do Plaintiff's national origin discrimination claims relate "to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education"? *Cave*, 514 F.3d at 245 (internal quotation marks omitted). Regardless of whether Plaintiff's claims are compensable under tort law, Plaintiff has not brought a common law tort claim—she seeks redress under federal statutes, and she must comply with the procedures proscribed by those statutes in order to obtain relief.

Plaintiff also contends that Defendants are wrong to suggest that "if Plaintiff's claims involve educational disability at all, they cannot also rest on national-origin discrimination," because the "phenomenon is quite common." (Pl.'s Opp'n 9.) Again, this argument elides the crucial question at issue here, and instead invites the Court to rewrite the statute or ignore binding circuit precedent. The law is clear that if a plaintiff seeks redress for a deprivation of educational opportunities owed to her under the IDEA, administrative exhaustion of those claims is mandatory, "regardless of the statutory basis of their complaint." *Cave*, 514 F.3d at 246. The cases cited by Plaintiff, which arise in the context of patent law, (*see* Pl.'s Opp'n 9), are far afield from any of the issues presented here.

In support of her argument, Plaintiff provides an example wherein two students are placed into ESL instruction by virtue of the fact that their parents' speak Spanish to each other at home (though only English to the children). (*See id.* at 9–10.) The only difference between the two children in Plaintiff's hypothetical is that one has special education needs and the other does not. (*See id.*) In Plaintiff's view, the child with special education needs should not be subjected to additional administrative burdens in order to bring a claim for national origin discrimination. (*See id.* at 10.)

In the first instance, it is unclear what the basis for a national origin discrimination claim in such circumstances would be—nowhere in Plaintiff's hypothetical (which, she alleges, reflects her situation) do the facts suggest that the placement of the children into ESL was on the basis of national origin discrimination. By Plaintiff's own admission, the placement in ESL (in the hypothetical and in reality) was due to the fact that Plaintiff's parents spoke a language other than English in the home and Plaintiff scored poorly on the English proficiency test. (*See id.* at 9–10.) These factors operate independently of the national origin of either Plaintiff or her

parents; that is, a student of any national origin may come from a household where a language other than English is spoken and may score poorly on an English proficiency test.

But more fundamentally, Plaintiff again asks the Court to make policy judgments about the IDEA. It may be the case, from Plaintiff's perspective, that Congress could or should have drafted the IDEA more narrowly, or that the Second Circuit has imposed more onerous burdens on students with special education needs than those without. But it is not the province of this Court to make such judgments. *See Harbison v. Bell*, 556 U.S. 180, 198 (2009) ("Even if the proper interpretation of a statute upholds a very bad policy, it is not within our province to second-guess the wisdom of Congress' action by picking and choosing our preferred interpretation from among a range of potentially plausible, but likely inaccurate, interpretations of a statute." (internal quotation marks omitted)). The law in the Second Circuit is clear that claims that seek to effect the IDEA's goal "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living" fall within the purview of the IDEA's exhaustion requirement. *Cave*, 514 F.3d at 248 (emphases and internal quotation marks omitted).

The Second Amended Complaint makes clear that Plaintiff's claims arise out of the fact that her improper placement "caused [Plaintiff] great upset [sic], mental anguish and embarrassment, was educationally unnecessary, and deprived her of educational opportunities," (Second Am. Compl. ¶ 36), and that national origin discrimination is merely the cause of the deprivation of her educational opportunities, (*see id.* ¶¶ 33, 58). It is the quality of her education that Plaintiff protests, and such claims relating to special education are governed by the IDEA. Yet, an administrative remedy was available to Plaintiff and her parents throughout Plaintiff's

elementary school experience, but chose not to take advantage of it. Instead, Plaintiff, having eschewed the available remedy—placement into an appropriate educational environment—instead seeks damages for past alleged deprivations of educational opportunities. These claims fit squarely within the ambit of claims covered by the IDEA and are subject to the exhaustion requirement, and the fact that Plaintiff believes her lack of educational opportunities was attributable to her national origin is of no moment.

Finally, Plaintiff raises two more arguments against exhaustion that warrant little attention. First, she points out that "[a] teacher who physically abused children in her care would be liable for assault and battery, even if those children had IDEA classification." (Pl.'s Opp'n 11.) This statement is indisputably true, *see Karlen*, 638 F. Supp. 2d at 300 (holding that even absent exhaustion, the court had jurisdiction to consider "equal protection or racial discrimination claims not implicating the diagnosis of the children's disabilities or the adequacy of the educational services provided to the children"), but that does nothing to help Plaintiff. Here, there is no question that the § 1983 and Title VI claims relate to the provision of educational services to a student falling within the purview of the IDEA, not an assault and battery or other conduct unrelated to those services.

Second, Plaintiff cites *Patsy v. Board of Regents*, 457 U.S. 496 (1982), for the proposition that there is no general exhaustion requirement for § 1983 cases. (*See* Pl.'s Opp'n 5.) This precise argument—indeed, reliance on this precise *case*—was squarely rejected in the context of an IDEA claim in *Cave*, *see* 514 F.3d at 248, and warrants no further discussion here.

Plaintiff's arguments are therefore unpersuasive; absent some exception, all of Plaintiff's federal claims are subject to the IDEA's exhaustion requirement.

Notwithstanding the general applicability of the IDEA's exhaustion requirement to Plaintiff's federal claims, there are some exceptions to the requirement.

Exhaustion under the IDEA is excused "in situations in which exhaustion would be futile because administrative procedures do not provide adequate remedies." *Polera*, 288 F.3d at 488 (internal quotation marks omitted). Put another way, exhaustion is excused "if (1) it would be futile to resort to the IDEA's due process procedures; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; or (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies." *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199 (2d Cir. 2002).

The second category of exceptions, where an agency has adopted a policy of general applicability that is contrary to law, is implicated by "wrongdoing that is inherent in the program itself and not directed at any individual child." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 113 (2d Cir. 2004) (internal quotation marks omitted). The common thread in such cases is that the claimant's "problems could not have been remedied by administrative bodies because the framework and procedures for assessing and placing students in appropriate educational programs were at issue, or because the nature and volume of complaints were incapable of correction by the administrative hearing process." *Id.* at 114. "The rationale behind this exception is that while the administrative hearing officers have the authority to enforce established regulations, policies and procedures, they generally do not have the authority to set new policies or to alter existing ones." *King v. Pine Plains Cent. Sch. Dist.*, 918 F. Supp. 772, 781 (S.D.N.Y. 1996). In order to discern whether a claim falls within this second exception, courts consider the distinction between "the problem of inadequate educational programs and

facilities, which constitute systemic violations to be addressed by the federal courts," and "technical questions of how to define and treat individual students' learning disabilities, which are best addressed by administrators." *Scaggs*, 2007 WL 1456221, at *7.

At first glance, one might conclude that Plaintiff is raising a claim challenging the policy of Defendants to designate students as LEP and place them in ESL instruction even if they speak no language other than English. But while this is, in part, the gravamen of Plaintiff's state law claims—these claims invoke N.Y Educ. Law § 3204(3), which (under Plaintiff's reading) compels school districts to place students in ESL instruction only if they speak a language other than English—it is not the basis for Plaintiff's federal claims. Plaintiff does not and cannot allege that it is a violation of the IDEA, Title VI, or the Equal Protection Clause to place a student in ESL instruction even if that student does not speak any language other than English— that violation occurs, if at all, only under state law. Rather, Plaintiff's claim is that *she* did not belong in ESL instruction and that her placement in that program was inappropriate in light of the fact that her inability to demonstrate English proficiency was a consequence of her learning disability and not of her parents' use of another language in the household. *See Kalliope R. ex rel. Irene D. v. N.Y. State Dep't of Educ.*, 827 F. Supp. 2d 130, 139 (E.D.N.Y. 2010) ("[E]xhaustion is required when the plaintiff's allegations depend on individual characteristics . . . ."). Moreover, Plaintiff points to no other circumstances, other than her own, in which a child covered by the IDEA was deprived of special education benefits because of a policy or practice of the District. *See Intravaia ex rel. Intravaia v. Rocky Point Union Free Sch. Dist.*, 919 F. Supp. 2d 285, 295 (E.D.N.Y. 2013) (finding that exhaustion was not excused where the plaintiffs "fail[ed] to plead any facts indicating how many special needs students—or more specifically, autistic children—were affected by [the] defendants' purported violations").

As courts have recognized, "[i]t is clear that a challenge to the placement of a disabled student is a matter that is within the ambit of the administrative scheme provided by the IDEA," and therefore not exempt from exhaustion.  *C.K. v. Bd. of Educ. of the Westhampton Beach Sch. Dist.*, 185 F. Supp. 3d 317, 330 (E.D.N.Y. 2016).  It is only where a claimant alleges "systemic problems" that exhaustion is excused under this rule.  *J.S.*, 386 F.3d at 115.  Plaintiff does not do so here, and the claims alleged here are not of the kind held sufficient by courts to excuse exhaustion.  *See, e.g.*, *Handberry v. Thompson*, 446 F.3d 335, 344 (2d Cir. 2006) (holding that exhaustion was excused where the "plaintiffs challenge[d] the [Department of Education's] and [the Department of Corrections'] actions with respect to providing educational service to all entitled inmates at Rikers Island"); *J.S.*, 386 F.3d at 115 (holding that exhaustion was excused where the plaintiffs challenged "the [s]chool [d]istrict's total failure to prepare and implement Individualized Education Programs," among other systemic issues); *Heldman*, 962 F.2d at 159 (holding that exhaustion was excused because the plaintiff challenged the "regulation specifying the hearing officer selection procedure" and "neither the [c]ommissioner nor the assigned hearing officer ha[d] the authority to alter the procedure"); *Kalliope R.*, 827 F. Supp. 2d at 139 (holding that exhaustion was excused where the plaintiffs challenged a state department of education policy preventing schools and parents from using a modified student-to-teacher ratio). The facts of this case plainly bear little resemblance to those cases in which exhaustion has been excused on account of a policy or practice of general applicability, and Plaintiff's failure to put forth anything more than a conclusory statement otherwise confirms that conclusion.  (*See* Pl.'s Opp'n 15.)[3]

---

[3] To the extent Plaintiff intends to argue that exhaustion is excused as futile because she is seeking monetary damages for past violations (which abated during her fifth-grade year), that argument was squarely rejected in *Polera*.  *See* 288 F.3d at 490 ("The fact that the administrative

Thus, exhaustion was required for each of Plaintiff's federal claims and was not excused. For that reason, the Court lacks jurisdiction over the federal claims and dismissal of those claims is therefore appropriate.

### 2. State Law Claims

It is well settled that although supplemental jurisdiction exists over state law claims that "form part of the same case or controversy" as federal claims, 28 U.S.C. § 1367(a), a district court may decline to exercise such supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction," *id.* § 1367(c)(3). The Supreme Court has further instructed that "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The Second Circuit has advised, in similar circumstances, that New York state courts are "in the best position to determine the validity of [the plaintiffs'] novel state law claims." *Cave*, 514 F.3d at 250. For that reason, Plaintiff's state-law claims are dismissed without prejudice.

---

process could not provide damages does not render [the plaintiff's] claim futile; she could have obtained complete relief at the time, through changes to her IEPs, additional educational services, and, if necessary, remedial education.").

## III. Conclusion

For the foregoing reasons, Plaintiff's federal claims are dismissed. Because this is the

third iteration of the complaint, the dismissal is with prejudice. The state law claims are

dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the pending

Motion, *(see* Dkt. No. 43), and close the case.

SO ORDERED.

DATED:      September 27, 2017
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE